UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENA ANGELA MONROE,

        Plaintiff,

vs.

CNA INSURANCE COMPANY,

        Defendant.
_____/

Case No. 05-70446

HON. GEORGE CARAM STEEH

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT

### INTRODUCTION

Plaintiff Lena Monroe seeks the reinstatement of disability benefits under an insurance policy issued by defendant CNA Insurance Company ("CNA"), purchased by Monroe's former employer, the Bartech Group. CNA has moved for judgment, asserting its termination decision was supported by substantial evidence in the record. Because the court agrees with that position, and finds the decision to terminate benefits was neither arbitrary nor capricious, judgment will enter for defendant.

### BACKGROUND

Plaintiff is a former Quality Vice President of the Bartech Group, a temporary staffing business, which was her employer from 1978 to 2002. In that job, plaintiff was engaged in audits of and staff training at nine Bartech office locations in Michigan, Florida, and Ohio. Plaintiff asserts that her job required travel 25-30 weeks out of the year, for audits and training sessions. The travel was done mostly by automobile, with

the longest trip being a one-hour drive.  The job occasionally required plaintiff to carry manuals, books, and training materials to and from her desk and car.

Plaintiff filed her first claim for benefits under Bartech's disability plan on October 14, 2002.  She claimed that incapacitating headaches made it impossible for her to perform her job duties.  Plaintiff's treating physician, Seemant Chaturvedi, M.D., submitted a "Medical Assessment Tool Form" on November 11, 2002, which indicated that plaintiff was subject to "restrictions" (a box with that label was checked on the form), but did not elaborate.  Dr. Chaturvedi noted a possible return date of "2/2003," and attached 32 pages of reports summarizing consultations and tests.

Plaintiff's claim for short term benefits was preceded by a series of doctor visits and medical tests, beginning with a brief hospitalization in July, 2002.  Plaintiff was hospitalized at the Detroit Medical Center on July 26, 2002 with "five days duration of bi-frontal headaches."  Tests conducted on the plaintiff were consistent with a rare medical condition called Moya-Moya Disease.[1]  Plaintiff's medical history documented at that time showed she had suffered from Graves Disease, had been involved in a motor vehicle accident, resulting in chronic lower back pain (for which she had a "morphine pump").  These reports do not contain any recommendations concerning plaintiff's ability to work.

During or within days of plaintiff's hospitalization, she saw Dr. Chaturvedi at Harper Hospital in Detroit, on July 31, 2002, when he diagnosed her with a severe headache and "Moya-Moya like changes."  She also saw Dr. Phillip Steig, M.D., a

---

[1] Defendant describes this as "a cerebrovascular disorder involving narrowing or occlusion of blood vessels into the brain."

neurosurgeon from Cornell University, who agreed "Ms. Monroe presents the Moya-Moya variant," and stated that she also had symptomatic Lupis Erythematosus. He prescribed one aspirin per day and recommended continued observation.

A few days later, plaintiff saw Dr. Dorian Moore, of Indiana University, who also opined that plaintiff had Moya-Moya Disease. Defendant points out that while there, she saw a Dr. Pritz, who opined that "her recent complaints of headache were not associated with a neurologic event and that the moya moya pattern on her angiogram...has probably been present for at least a period of time." AR 247. She later saw Dr. Chaturvedi twice in October, 2002, who noted that plaintiff's headaches had improved, but on October 28, 2002, recommended restriction from work "from July 2002 to "TBD."" He estimated a return to work date of February 2003 "possibly."

In November 2002, defendant determined that it was "reasonable to approve benefits [until] after MRI/MRA is performed in January," so at that juncture plaintiff was informed that her short term disability benefits claim had been approved, and that her claim for long term benefits would be reviewed before the short term benefits came to an end. Plaintiff was interviewed by Nicole Ellington, who was handling the claim for defendant. Plaintiff stated she could drive a car occasionally, and that she could perform average daily living activities without difficulty.

Dr. Chaturvedi maintained in January 2003 that plaintiff was not capable of performing her job duties. His response to the section concerning "specific limitations/restrictions" was that plaintiff is "completely disabled-still has persistent headaches-stress can trigger or exacerbate the headaches...." Defendant points out that the documentation offered in support of this opinion was a report of a December 5,

3

2002 office visit, after which he reported that plaintiff was not experiencing new neurologic symptoms, but was having "occasional headaches, which are pounding, and they usually last for maybe one hour," and that they "may occur two to three days out of the week." AR 229-30. He continued his prescription of one baby aspirin per day, for stroke prevention, and recommended additional testing. Id.

Plaintiff had an MRI of the brain on January 15, 2003, and in February, 2003, defendant notified plaintiff that her claim for long-term disability benefits had been approved, stating "future benefits will [be] determined by our review of the current medical information." AR 220. Nicole Ellington again interviewed plaintiff, who told her again that she could do daily activities, and drive. When asked why she could not return to work, she stated "cognitive reasons including inability to think and loss of memory." AR 219.

In April 2003, plaintiff went through neuropsychological testing performed by Darren Fuerst, Ph.D., who reported that "Monroe's cognitive skills are grossly intact and a return to work may be considered, at least from a neuropsychological standpoint." AR 200. In June, 2003, plaintiff was interviewed again over the telephone by Nicole Ellington. Plaintiff related that she could not work, due to headaches, job stress, and an inability to travel. She told Ellington that her doctor had prescribed Elevil, and had increased the dosage.[2]

Defendant retained a neurologist, Dr. Ronald Oppenheim, of Orlando, Florida, to review plaintiff's file in the summer of 2003. He found that plaintiff was capable of a

---

[2] Defendant points out Dr. Fuerst's report that Monroe told him she was not taking the Elevil prescribed by Dr. Chaturvedi.

4

"low physical demand job (sic) that requires some standing, walking, and driving." He noted that plaintiff required only minor medication for her headaches, and opined that plaintiff's headaches, beginning in June 2002, were "probably not a result of Moya-Moya Disease." He cited to a review published in 1998, which reported that "headaches was a presenting symptoms (sic) in only one of 35 cases and probably therefore coincidental." AR at 142.

Dr. Oppenheim talked to Dr. Chaturvedi on August 1, 2003, and summarized the conversation for a representative of defendant. He asserted that although Dr. Chaturvedi "[felt] that the headaches are incapacitating and prevent Ms. Monroe from going about her normal activities," that diagnosis was inconsistent with a surveillance tape defendant had made of plaintiff's activities.

Defendant performed a claim investigation in June, 2003, when it sent daily activity log sheets to plaintiff, and conducted surveillance on Friday, June 20, and Saturday, June 21. The surveillance showed that plaintiff left her home on Friday at 9:00 a.m., returned at 1:15 p.m. with two other women, left again in a car, and had not returned by 3:38 p.m. On Saturday, although plaintiff reported on the log sheets as being home with a level 9 headache from 4:00 a.m. through noon, the camera showed that she left the house at 8:49 a.m., went on errands to three stores, and returned home at approximately 10:00 a.m.

Plaintiff's claim for long-term benefits was denied by defendant on August 26, 2003. Plaintiff appealed the decision, and secured two letters from Dr. Chaturvedi in support of her position. He initially wrote that she was being evaluated for surgery, and although ultimately her neurosurgeon at Harper Hospital did not recommend the

surgery, Dr. Chaturvedi opined that plaintiff suffered from "severe headaches caused by impaired blood flow to the brain," and that "stress can exacerbate the occurrence of headaches." In addition to these records, plaintiff faxed to her adjuster at the defendant's office two articles on Moya-Moya Disease in December 2003, which listed possible symptoms of the disease, including "stiff neck, nausea, vomiting, [and] unconsciousness."

During the appeal process, defendant had plaintiff examined by a Dr. Brian Wolf, who made findings "consistent with Moya-Moya Disease," but that "according to the reports of the examiners, she only has headaches a few hours a week," which plaintiff relieved with over-the-counter analgesics. While Dr. Wolf felt that it was possible that plaintiff's restrictions could change in the future, should the disease prove to be progressive, he noted that "75% of patients with Moya-Moya syndrome are not disabled and lead normal lives."

Defendant declined plaintiff's appeal of the denial of benefits on February 19, 2004, when it upheld its earlier termination of benefits. Plaintiff filed this lawsuit on February 4, 2005, appealing defendant's decision. The two-count lawsuit asserts plaintiff's entitlement to disability benefits under ERISA, § 502(A)(1)(b), and in the second count asserts a breach of fiduciary duty by defendant under § 502(a)(3). Defendant's motion for judgment as to both counts is discussed and decided below.

## STANDARD

When this court reviews a denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B), such review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the

terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In that event, the review is under the arbitrary and capricious standard. Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 361 (6th Cir. 2002).

Under the arbitrary and capricious standard of review, the court determines if the plan administrator's decision was rational, taking into consideration the provisions of the plan involved. McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 168 (6th Cir. 2003). The court may consider only the materials contained in the administrative record. Peruzzi v. Summa Med. Plan, 137 F.3d 431, 433-34 (6th Cir. 1998). As stated in the McDonald decision, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." McDonald, 347 F.3d at 168.

The defendant and plaintiff in this case agree that the arbitrary and capricious standard is the correct standard of review for this matter.

## ANALYSIS

### Count II–Breach of Fiduciary Duty

Defendant asserts that plaintiff's fiduciary duty claim fails to state a claim upon which relief may be granted, because in it plaintiff seeks the very benefits she claims in the first count. Defendant correctly contends that a claim made under § 502(a)(3) may seek recovery only on behalf of the plan itself, citing Massachusetts Mutual Life Ins. Co. V. Russell, 473 U.S. 134 (1985), Kuper v. Iovenko, 66 F.3d 1447 (6th Cir. 1995). Plaintiff does not contest this assertion. Accordingly, judgment will enter for defendant as to the second count.

7

Count I-Recovery of Disability Benefits

According to the plan at issue in this litigation, "disability" means that "during the elimination period and the following 24 months, injury or sickness causes physical or mental impairment to such a degree or severity that you are 1) continuously unable to perform the material and substantial duties of your regular occupation; and 2) not working for wages in any occupation for which you are or become qualified by education, training or experience.[3]  AR at 5.  Further, the plan requires that "proof of disability" be provided by each claimant, as follows:

> 5.  Objective medical findings which support *Your Disability*.  Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s).
>
> 6.  The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

Plaintiff compares the findings of her treating physicians with those of the doctors retained by defendant, Drs. Oppenheim and Wolf.  She argues that by accepting the opinions of Drs. Oppenheim and Wolf, "CNA ignored overwhelming medical evidence to the contrary and favoring these opinions of doctors who only reviewed records and did not treat Ms. Monroe, the plan administrator acted in an arbitrary and capricious manner."  Further, she asserts that although Dr. Oppenheim asserted that Moya-Moya Disease does not cause headaches, the article to which he cited nowhere contained

---

[3] After the benefit has been payable for 24 months, "disability" means physical or mental impairment to such a degree or severity that you are 1) continuously unable to engage in any occupation for which you are or become qualified by education, training or experience; and 2) not working for wages in any occupation for which you are or become qualified by education, training or experience.

such information.[4]  She also argues that although Dr. Wolf found she could work at a "sedentary/light level," there is no information in the record that indicates that her job with Bartech was either sedentary or light.

As argued in defendant's reply brief, plaintiff does not actually contend that the physical requirements of her job at Bartech were other than sedentary or light[5], or that Dr. Wolf was limiting her to a position which required less physical activity than her position with Bartech.  Rather, as defendant points out, plaintiff emphasizes that the job was "highly stressful."  Also, as repeatedly shown by defendant and outlined above, although there is certainly record evidence that plaintiff suffers from headaches, there is also definitive evidence that the headaches occur (or were then occurring) several times a week, rather than continuously or even daily, and that plaintiff is able to ameliorate the headaches with analgesics.  See, e.g., December 2002 report of Dr. Chaturvedi, reports of Drs. Wolf and Oppenheim.

Concerning the surveillance, plaintiff asserts that she only filled out the log defendant contends conflicts with the surveillance after the fact.  Specifically, she states that she had not in fact filled out the log when the insurance investigator knocked on her door, and she filled it out under duress, making mistakes, which account for the inconsistencies with the video surveillance.  However, even accepting these assertions as true, they do not change the fact that the video surveillance clearly showed plaintiff

---

[4] As discussed at oral argument, it appears that the article in the record may be incomplete or other than the article cited by the physician.

[5] Defendant's reply brief includes the definitions of light and sedentary work according to 20 C.F.R. §§ 404.1567(a), (b), which plaintiff did not contest at oral argument.

capable of running errands and engaging in normal day to day activities, which plaintiff nowhere disputes defendant could consider in making its decision.

As defendant contends, the court is not required to approve a claim for benefits based solely on any claimant's *particular* medical diagnosis. Rather, it is the claimant's ability to perform the duties of her job that is the determining factor. Defendant cites to Jordan v. Northrop Grumman Corp., 370 F.3d 869, 877 (9th Cir. 2004) for this proposition. The court cannot find that it was arbitrary and capricious for the defendant to determine plaintiff was not "continuously unable to perform the material and substantial duties of your regular occupation," as required by the plan. As defendant wrote, in its letter denying plaintiff's appeal of the denial of benefits:

> \*\*\*
> Our decision however was based upon the totality of the information provided on your behalf. The most recent report from Dr. Seemant Chaturvedi indicated that it was in your best interest medically to remain off work. However this report did not include any findings supporting your inability to continue in your previous occupation. This was based upon what can occur if you return to work in a stressful occupation. Dr. Chaturvedi stated that since your work situation is stressful this precipitates headaches. While we understand the concern, unfortunately this policy does not pay benefits based upon the possibility of a disability. And, remaining out of work for stress management also does not qualify a person for disability.
> \*\*\*

AR 66.

While the court can certainly appreciate that an individual with plaintiff's diagnosis might justifiably decide to remain out of the work force, the court can also appreciate that defendant's policy does not require it to make payments to individuals who decide the risk of future health issues outweighs their need or desire to work. As discussed on the record, it is likely numerous people are faced with such a decision from time to time,

with some deciding to continue working and others making the opposite decision. For instance, the court notes the case of Leipzig v. AIG Life Insurance Co., 362 F.3d 406, in which the Seventh Circuit affirmed the denial of benefits for a "chief dealer" at the Chicago Mercantile Exchange, in which it was argued that the stress of the job was too much for plaintiff, who had suffered chest pains and undergone angioplasty.[6]

Accordingly, the court finds that there was substantial evidence in the record to support defendant's decision that plaintiff could perform the material and substantial duties of her occupation and terminate benefits, and that in any event, the decision was reasonably made and was not arbitrary and capricious.

## CONCLUSION

---

[6] As that court noted, in its discussion:
Many persons with serious heart conditions work at stressful jobs for years without ill effects. Think of President Eisenhower, Vice President Cheney, and Associate Justice Stevens. AIG concluded that Leipzig is in the same category. Leipzig submitted the reports of several physicians who concluded that he should not hold a high-stress job. AIG sent the file to Costas Lambrew, an independent cardiovascular specialist who concluded that medical data show that Leipzig's blood pressure is under control and his "coronary artery disease stable and asymptomatic." Dr. Lambrew concluded that Leipzig could return to work with no restrictions. AIG adopted this view, observing at face value what patients tell them about their symptoms; but insurers such as AIG must consider the possibility that applicants are exaggerating in an effort to win benefits....

For the reasons stated above, defendant's motion for judgment is hereby GRANTED. The complaint shall be dismissed in its entirety.

Dated: August 29, 2006

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 29, 2006, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---